IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

MICHAEL WAYNE KEYS,

Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

Defendant.

No. C11-0014

RULING ON JUDICIAL REVIEW

## TABLE OF CONTENTS

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.  PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III. PRINCIPLES OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV.  FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
     A.   Keys' Education and Employment Background . . . . . . . . . . . . . . . 5
     B.   Administrative Hearing Testimony . . . . . . . . . . . . . . . . . . . . . . . 5
          1.   Keys' Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
          2.   Vocational Expert Testimony . . . . . . . . . . . . . . . . . . . . . . . 7
     C.   Keys' Medical History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

V.   CONCLUSIONS OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
     A.   ALJ's Disability Determination . . . . . . . . . . . . . . . . . . . . . . . . 12
     B.   Objections Raised By Claimant . . . . . . . . . . . . . . . . . . . . . . . . 13
          1.   Dr. Kozeny's Opinions . . . . . . . . . . . . . . . . . . . . . . . . . . 14
          2.   Substantial Medical Evidence . . . . . . . . . . . . . . . . . . . . . 17
          3.   Credibility Determination . . . . . . . . . . . . . . . . . . . . . . . . 18

VI.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

VII. ORDER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## I.  INTRODUCTION

This matter comes before the Court on the Complaint (docket number 3) filed by Plaintiff Michael Wayne Keys on February 8, 2011, requesting judicial review of the Social Security Commissioner's decision to deny his applications for Title II disability insurance benefits and Title XVI supplemental security income ("SSI") benefits.  Keys asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide him disability insurance benefits and SSI benefits.  In the alternative, Keys requests the Court to remand this matter for further proceedings.

## II.  PROCEDURAL BACKGROUND

On April 19, 2006, Keys applied for both disability insurance benefits and SSI benefits.  In his applications, Keys alleged an inability to work since January 26, 2005 due to arthritis in his hips, rotator cuff problems, and hepatitis C.  Keys' applications were denied on June 19, 2006.  On November 17, 2006, his applications were denied on reconsideration.  On January 4, 2007, Keys requested an administrative hearing before an Administrative Law Judge ("ALJ").  On October 22, 2008, Keys appeared via video conference with his attorney before ALJ Debra Bice for an administrative hearing.  Keys and vocational expert Carma Mitchell testified at the hearing.  In a decision dated December 16, 2008, the ALJ denied Keys' claims.  The ALJ determined that Keys was not disabled and not entitled to disability insurance benefits or SSI benefits because he was functionally capable of performing work that exists in significant numbers in the national economy.  Keys appealed the ALJ's decision.  On December 20, 2010, the Appeals Council denied Keys' request for review.  Consequently, the ALJ's December 16, 2008 decision was adopted as the Commissioner's final decision.

On February 8, 2011, Keys filed this action for judicial review.  The Commissioner filed an Answer on September 7, 2011.  On October 14, 2011, Keys filed a brief arguing that there is not substantial evidence in the record to support the ALJ's finding that he is not disabled and that she is functionally capable of performing work that exists in

significant numbers in the national economy. On December 14, 2011, the Commissioner filed a responsive brief arguing that the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. On April 4, 2011, both parties consented to proceed before a magistrate judge in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

## III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). Pursuant to 42 U.S.C. § 1383(c)(3), the Commissioner's final determination after an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). Title 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id*.

The Court will "affirm the ALJ's decision if it is supported by substantial evidence on the record as a whole." *Gates v. Astrue*, 627 F.3d 1080, 1082 (8th Cir. 2010) (citation omitted). Evidence is "substantial evidence" if a reasonable person would find it adequate to support the ALJ's determination. *Id*. (citing *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)); *see also Wildman v. Astrue*, 596 F.3d 959, 963-64 (8th Cir. 2010) ("'Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion.' *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000).").

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Moore v. Astrue*, 623 F.3d 599, 602 (8th Cir. 2010);

*see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (Review of an ALJ's decision "extends beyond examining the record to find substantial evidence in support of the ALJ's decision; [the court must also] consider evidence in the record that fairly detracts from that decision."). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Casey v. Astrue*, 503 F.3d 687 (8th Cir. 2007), the Eighth Circuit further explained that a court "will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id.* at 691 (citations omitted). "A decision is not outside that 'zone of choice' simply because [a court] may have reached a different conclusion had [the court] been the fact finder in the first instance." *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006). Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams*, 393 F.3d at 801 (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Wildman*, 596 F.3d at 964 ("If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently."); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'If there is substantial evidence to support the Commissioner's conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion.' *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).").

## IV. FACTS

### A. Keys' Education and Employment Background

Keys was born in 1957.  Keys testified that he dropped out of school in the eighth grade.  He never earned a GED.  He testified that "I've basically been a labor worker my entire life."[1]

The record contains a detailed earnings report for Keys.  The report covers the time period of 1980 to 2008.  In 1980, Keys earned $2,358.05.  He earned $261.30 in 1981.  He had no earnings in 1982, 1985, 1986, and 1987.  He had only minimal earnings in 1983 and 1984 (less than $1,000.00 each year).  From 1988 to 2005, Keys earned between $2,761.90 (2005) and $26,356.36 (2002).  He has no earnings since 2006.

### B. Administrative Hearing Testimony

### 1. Keys' Testimony

At the administrative hearing, the ALJ inquired whether Keys had performed any type of work since 2005.  In response, Keys explained that:

> No ma'am, your honor, I haven't been able to do any work--
> the last day I worked at Iowa Specialties I left the job because
> of my arms, I couldn't lift my arms anymore so I left there
> went to the emergency room to have it looked at and that's
> when I went to another doctor who suggested that I go to Iowa
> City[.] . . .
>
> because of the severity of the arthritis in my shoulders.

(Administrative Record at 30-31.)  The ALJ asked Keys to describe his limitations caused by his shoulder arthritis:

> A:   Well, I can't reach my arms up, straight up, above my
> head, I'm limited from that.  I probably wouldn't be
> able to play tennis anymore because I can't rotate my
> shoulders.  I could barely put my arms behind my back.
> I'm limited in all the positions and things I would have
> to do in order to lift or -- actually I'm on a 10 pound or

---

[1] Administrative Record at 28.

> 20 pound weight restriction lifting anyway, so I'm pretty limited with [them].

Q:   Okay.  So are you able to lift overhead at all?

A:   I probably could lift overhead, but nothing that's extremely heavy or anything over 20 pounds --

Q:   Okay.

A:   -- and I probably couldn't do it, you know, in a continuance, you know, time.

Q:   Do you still have pain in your shoulders?

A:   Yes I do, in the winter.  Usually it's mostly bad in the wintertime when the weather gets colder, if it's a damp, kind of damp, dreary day.

(Administrative Record at 31-32.) Keys also indicated that he has difficulty with his hands due to arthritis. Specifically, Keys testified that he had trouble holding onto things and gripping things. Keys further testified that he has pain and limitations due to problems with his knees. For example, Keys stated that he has difficulty squatting and going up and down stairs. Additionally, Keys reported suffering from back pain due to a herniated disc, and having low energy from Hepatitis C.

Next, the ALJ asked Keys to describe his typical day:

Q:   Can you tell me about -- just a typical day for you about what time do you get up in the morning?

A:   I'm usually up around 5:30, 6:00 o'clock, 6:30 at the latest.  Get up, usually first thing I'll hit the showers, try to get some good hot water on me so that my, you know, get my bones all loosened up and stuff --

Q:   Uh-huh.

A:   -- and maybe go upstairs and have something to eat, cup of coffee, get the kids rounded up, get them dressed for school and stuff, and probably just plop down in my lounge chair, in grandpa's chair is what the kids call it. . . .

Q:   Okay.  So, after you get the kids off to school you said you sit in your recliner, what do you do while you're in your recliner?

A:   Well, I've got a little hand thingy that you can squeeze, a rubber ball, and I use that on my right hand a lot of times, kind of exercise my finger.  And I've got these rubber bands and things that I got from physical therapy

> that I use in order to keep my knees moving and, you
> know, do some exercises like that. I get down on the
> floor, do some exercises for my back. We've got a
> treadmill, you know, in the basement, so I may go
> down and walk on the treadmill just to kind of keep
> loosened up. And I'll get tired and I'll go and I'll sit
> down in my lounge chair and depending on if I got a
> good night's sleep or not I more than likely, my wife
> says I usually sit there and nod out.

(Administrative Record at 39-41.) When asked whether he performed any household chores, Keys replied that is able to do some minor chores, such as rinsing off dishes, loading the dishwasher, and doing a "little bit" of vacuuming. The ALJ also asked Keys to discuss his functional abilities. Keys asserted that he could: (1) sit in one spot or position for about 15 to 20 minutes before needing to get up and move around; (2) stand in one place for a short period of time; (3) walk about 2 blocks before becoming tired or having pain; and (4) lift a gallon of milk.

Lastly, the ALJ asked Keys to explain the "biggest reason" for his inability to work. Keys replied that:

> I would say probably because of my abdominal pain, and my
> shoulder pain, and my back flare up, and stuff. I just think
> that if I had to go work on a job, I would probably no be able
> to complete a whole day of work, and the employer --
> depending on the work, and I'm only a labor worker, which is
> gonna entail some sort of heavy lifting, or some sort of active
> movement . . . or something like that, and I just -- I can't even
> mow the lawn without . . . getting really, really tired and wore
> out so . . . I just, you know, I don't know what type work that
> would entail that, you know, I would probably be able to work
> and earn enough money to support my family with.

(Administrative Record at 50-51.)

### 2.   *Vocational Expert Testimony*

At the hearing, the ALJ provided vocational expert Carma Mitchell with a hypothetical for an individual who is able to perform:

> light work as defined by the secretary with the following
> additional restrictions:   the [individual] cannot do any
> overhead reaching with either arm, but is able to reach out in
> front of him without difficulty at, say, waist level; the
> individual can only occasionally squat, crawl, kneel . . . or
> crouch, and occasionally bend.

(Administrative Record at 58.) The vocational expert testified that under such limitations, Keys could not perform his past relevant work. The vocational expert further testified that Keys could perform the following work: (1) mail clerk (600 positions in Iowa and 40,000 positions in the nation), (2) collator (500 positions in Iowa and 52,500 positions in the nation), (3) inserting machine operator (200 positions in Iowa and 16,000 positions in the nation), and (4) marker (2,200 positions in Iowa and 177,000 positions in the nation).

### C. Keys' Medical History

In January 2005, Keys met with Merrilee Ramsey, ARNP, complaining of right hip pain. X-rays showed moderate degenerative changes in both hip joints. Keys was referred to physical therapy for treatment. On February 1, 2005, Keys returned to Ramsey complaining of bilateral shoulder pain. Ramsey referred Keys to physical therapy for additional work on his shoulders. On February 16, 2005, Keys met with Dr. Jeffrey M. Nassif, M.D., for further consideration of his shoulder pain. Upon examination, Dr. Nassif diagnosed Keys with rotator cuff tendinitis, AC joint arthritis, and impingement syndrome. Dr. Nassif prescribed anti-inflammatory medication and ordered physical therapy as treatment.

On April 12, 2005, Keys visited Dr. James V. Nepola, M.D., for a second opinion regarding his bilateral shoulder pain. In reviewing Keys' medical history, Dr. Nepola noted that:

> [Keys] began experiencing bilateral shoulder pain right greater
> than left in August 2004.  He complains of pain with overhead
> activities and while performing his job.  He also complains of
> pain while trying to sleep at night and he is forced to sleep on
> his back. . . .  He feels minimally improved after completing
> approximately 10 to 11 weeks of therapy.

(Administrative Record at 376.)  Upon examination, Dr. Nepola diagnosed Keys with bilateral AC joint arthropathy.  Keys was given an epidural injection in his shoulders as treatment.  On June 7, 2005, Keys had a follow-up appointment with Dr. Nepola.  After discussion with Dr. Nepola, Keys decided that he would undergo surgery on his shoulders. On June 30, 2005, Keys underwent surgery on his left shoulder.  In August 2005, Dr. Nepola opined that Keys was "progressing as expected."  Dr. Nepola encouraged Keys to continue strengthening his active and passive range of motion with his left shoulder.  On September 14, 2005, Keys underwent surgery on his right shoulder.  At a follow-up appointment on November 1, 2005, Dr. Nepola found that Keys was "healing well," and released him to return to work with a restriction from performing overhead repetitive work.

On June 15, 2006, Dr. Jan Hunter, D.O., reviewed Keys' medical records and provided Disability Determination Services ("DDS") with a physical residual functional capacity ("RFC") assessment for Keys.  Dr. Hunter determined that Keys could: (1) occasionally lift and/or carry 20 pounds, (2) frequently lift and/or carry 10 pounds, (3) stand and/or walk with normal breaks for at total of about six hours in an eight-hour workday, (4) sit with normal breaks for a total of about six hours in an eight-hour workday, and (5) push and/or pull without limitations.  Dr. Hunter also determined that Keys could occasionally climb, balance, stoop, kneel, crouch, and crawl.  Additionally, Dr. Hunter opined that Keys was limited in the ability to reach in all directions. Specifically, Dr. Hunter stated that "[b]ilateral overhead reaching [was] limited to occasional for Keys."[2]  Dr. Hunter found no visual, communicative, or environmental limitations.  Dr. Hunter concluded that:

> [Keys] is able to perform personal cares, help with household chores, shop, and assist with childcare. He does report fatigue which limits his activities.  [Keys] does have medically determinable impairments that would reasonably create limitations as outlined in the RFC.  Although his medical

[2] Administrative Record at 516.

> treatment has been sporadic, this is likely due to lack of
> medical insurance.

(Administrative Record at 518.)

On August 8, 2006, Keys underwent a polysomnographic recording of nocturnal sleep. According to Dr. Scott Geisler, M.D., Keys reported trouble sleeping at night, being sleepy during the daytime, and snoring. Upon completion of the sleep study, Dr. Geisler diagnosed Keys with severe obstructive sleep apnea and frequent nocturia. Dr. Geisler recommended using a CPAP as treatment.

On September 12, 2006, Keys met with Dr. Nepola for a follow-up appointment. Dr. Nepola noted that:

> For [Keys'] right upper extremity he had a distal clavicle
> restriction done . . . last year and states that he is doing well
> but does have some occasional pain at the area of his
> restriction. He has not returned to work because he has
> secondary issue that has evolved, he now has hepatitis C and
> is on medication for this. The medication has made him very
> weak and tired and he has been unable to return to work. He
> states however that in daily functioning he does not have too
> much problem with his shoulder, it is just that he does have
> occasional pain.
>
> With his right arm he states that approximately 2 or 3 months
> [ago] he started having some numbness that would happen
> when [he] would wake up in the middle of the night with his
> right arm being numb[.] . . . He states that this has waxed and
> waned and that sometimes it is worse, sometimes better, and
> sometimes it does not bother him at all. . . .
>
> He also complains of some right hip and groin pain. . . . He
> states that he has quite a bit of pain when he arises from a
> chair and goes up and down stairs. Standing or lying supine
> does not cause him any significant problems. He does have a
> history of some back pain in the past, but this is not
> bothersome to him at this time.

(Administrative Record at 586.) Upon examination, Dr. Nepola found that Keys had only minimal tenderness in his shoulder and full range of motion. With regard to his shoulder,

Dr. Nepola opined that "[Keys] should discontinue activity as tolerated and we feel that he may be released to full work whenever he feels capable physically otherwise."[3]

On November 1, 2006, at the request of Keys' attorney, Dr. Richard Kozeny, one of Keys' treating physicians, filled out a "Musculoskeletal Impairment -- Residual Functional Capacity Questionnaire." Dr. Kozeny diagnosed Keys with sleep apnea, hepatitis C, hip pain, and arthritis of the hips, knees, and back. Dr. Kozeny reported that Keys' symptoms included fatigue, hip pain, headaches, ankle pain, and knee pain. In particular, Dr. Kozeny noted that Keys suffered from "excruciating" hip pain with standing and walking. Dr. Kozeny opined that Keys' pain would "constantly" interfere with his attention and concentration. Dr. Kozeny further opined that Keys could not work more than 2 hours per days. Dr. Kozeny found that Keys could sit or stand for 2 hours at one time. Dr. Kozeny also found that Keys could sit for about 4 hours in an eight-hour workday, and stand/walk for about 2 hours in an eight-hour workday. Dr. Kozeny also limited Keys from using his right hand for fine manipulation, and reaching overhead with both hands. Lastly, Dr. Kozeny concluded that Keys would miss about 3 or more days per month due to his impairments and/or treatment for his impairments.

On November 9, 2006, Keys was referred to Dr. Michael R. O'Rourke, M.D., for evaluation of his hip pain. Dr. O'Rourke noted that Keys had bilateral hip pain that was aggravated by movement and overuse. Dr. O'Rourke also noted that Keys could walk about 2 to 3 blocks. Upon examination, Dr. O'Rourke diagnosed Keys with degenerative arthritis of the right hip. Dr. O'Rourke recommended physical therapy and anti-inflammatory medication as treatment. Additionally, Dr. O'Rourke opined that Keys will "likely need" hip replacement in the future.

On May 16, 2007, Keys met with Dr. Kozeny complaining of back pain. An MRI of his back revealed moderate degenerative disc disease at L4-L5 and mild degenerative changes at L3-L4. Keys had a follow-up appointment with Dr. Kozeny on May 22, 2007. At the appointment, Keys stated that his back was feeling "much better." Dr. Kozeny

---

[3] Administrative Record at 587.

indicated that when Keys participates in physical therapy, it helps his back pain. Dr. Kozeny recommended epidural injections as treatment, if the back pain returned.

## V.  CONCLUSIONS OF LAW

### A.  ALJ's Disability Determination

The ALJ determined that Keys is not disabled.  In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations.  *See* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007); *Anderson v. Barnhart*, 344 F.3d 809, 812 (8th Cir. 2003).  The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger*, 390 F.3d at 590); *see also* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g).  "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled."  *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In order to establish a disability claim, "the claimant bears the initial burden to show that [he or] she is unable to perform [his or] her past relevant work."  *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998) (citing *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993)).  If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the residual functional capacity ("RFC") to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience.  *Id.*  The RFC is the most an individual can do despite the combined

effect of all of his or her credible limitations.  20 C.F.R. §§ 404.1545, 416.945.  "It is 'the ALJ's responsibility to determine [a] claimant's RFC based on all the relevant evidence, including medical records, observations of treating physicians and others, and [the] claimant's own description of her limitations.'"  *Page*, 484 F.3d at 1043 (quoting *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995)); 20 C.F.R. §§ 404.1545, 416.945.

The ALJ applied the first step of the analysis and determined that Keys had not engaged in substantial gainful activity since January 26, 2005.  At the second step, the ALJ concluded from the medical evidence that Keys had the following severe impairments: hepatitis C, irritable bowel syndrome, degenerative joint disease of the lumbar spine, bilateral shoulder surgery, sleep apnea, and degenerative joint disease of the hip.  At the third step, the ALJ found that Keys did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  At the fourth step, the ALJ determined Keys' RFC as follows:

> [Keys] has the residual functional capacity to perform light work . . . except [Keys] cannot do any overhead reaching with either arm but is able to reach out in front of him without difficulty at waist level.  [Keys] can only occasionally squat, crawl, kneel, crouch or bend.

(Administrative Record at 14.)  Also at the fourth step, the ALJ determined that Keys could not perform any of his past relevant work.  At the fifth step, the ALJ determined that based on his age, education, previous work experience, and RFC, Keys could work at jobs that exist in significant numbers in the national economy.  Therefore, the ALJ concluded that Keys was not disabled.

## B.  *Objections Raised By Claimant*

Keys argues that the ALJ erred in three respects.  First, Keys argues that the ALJ failed to properly consider the opinions of his treating physician, Dr. Kozeny.  Second, Keys argues that the ALJ's RFC assessment is not supported by substantial medical evidence.  Lastly, Keys argues that the ALJ failed to properly evaluate his subjective allegations of pain and disability.

### 1.   Dr. Kozeny's Opinions

Keys argues that the ALJ failed to properly evaluate the opinions of his treating physician, Dr. Kozeny. Specifically, Keys argues that the ALJ failed to give good reasons for discounting Dr. Kozeny's opinions. Keys concludes that this case should be remanded for further consideration of Dr. Kozeny's opinions.

An ALJ is required to "assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence on the record." *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2)). The opinion of a treating physician:

> should not ordinarily be disregarded and is entitled to substantial weight. A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.

*Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted).

"Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Id.*; *see also Travis*, 477 F.3d at 1041 ("A physician's statement that is 'not supported by diagnoses based on objective evidence' will not support a finding of disability. *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003). If the doctor's opinion is 'inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.' *Id.*"); *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004) (an ALJ does not need to give controlling weight to a physician's RFC assessment if it is inconsistent with other substantial evidence in the record); *Cabrnoch v. Bowen*, 881 F.2d 561, 564 (8th Cir. 1989) (the resolution of conflicts of opinion among various treating and examining physicians is the proper function of an ALJ).

The regulations also require an ALJ to give "good reasons" for giving weight to statements provided by a treating physician. *See* 20 C.F.R. § 404.1527(d)(2). The regulations also require an ALJ to give "good reasons" for rejecting statements provided by a treating physician. *Id.*; *see also Tilley v. Astrue*, 580 F.3d 675, 680 (8th Cir. 2009) ("The regulations require the ALJ to 'always give good reasons' for the weight afforded to the treating source's opinion.") (citation omitted).

In her decision, the ALJ addressed the opinions of Dr. Kozeny:

> Dr. Kozeny completed a medical source statement in November 2006. Dr. Kozeny opined that [Keys] experienced 'excruciating pain' with ambulation and 'constant pain severe enough to interfere with attention and concentration.' In addition, Dr. Kozeny indicated [Keys] could only work two hours, would have limitations on the use of his hands, and would miss work three days or so per month. The opinion expressed is quite conclusory, providing very little explanation of the evidence relied on in forming that opinion. The course of treatment pursued by the doctor has not been consistent with what one would expect if [Keys] were as severely limited as the doctor has reported. Most importantly, the doctor's opinion is without substantial support form the other evidence of record, which renders it less persuasive. For these reasons I have accorded his medical opinions little weight.

(Administrative Record at 16.) Keys argues that the ALJ's reasoning is unsound because she did not take into consideration the evidence regarding his alleged limitations from fatigue, handling and fingering, and the ability to stand due to hip pain, as discussed by Dr. Kozeny and other treating physicians in the administrative record. Contrary, however, to Keys' assertion, the ALJ did in fact address the issues of fatigue, handling and fingering, and hip pain. Specifically, the ALJ determined that:

> A Magnetic Resonance Imaging (MRI) test conducted in October 2006 revealed bilateral degenerative changes of the hips and possible minor osteonecrosis of the right femoral head, with no collapse. This was treated with only conservative care. Indeed, Daniel C. Fabiano, M.D.[,] reported in July 2008 that [Keys] was not taking any medication for joint pain. . . .  In addition, an x-ray was

administered of [Keys'] knee.   The results showed no radiographic evidence of any osteoarticular abnormality of the right knee and no radiographic evidence of osteoarticular abnormality of the left knee. . . .

Later, in September 2008, [Keys] reported to Julie L. Akers, R.N., that he had periodic episodes of back pain but believed it should get better on its own.   No further treatment was recommended for [Keys'] back pain. . . .

[Keys] experienced problems reaching overhead or behind or rotating his shoulder.   For that reason, [Keys] had bilateral shoulder surgery and resection to treat arthropathy involving the shoulder region.   In November 2005, Dr. James V. Nepola, M.D., released [Keys] to work with no restrictions, except for recommending no overhead or repetitive work. These restrictions are consistent with the residual functional capacity detailed above.

[Keys] has received treatment for pain in his hands.   Roy Kottal, M.D., reported [Keys] had minimal arthritic change in his hands and there was no evidence of erosions or fractures. Dr. James C. Johns, Jr., M.D., treated [Keys] in December 2007 for joint pain in [his] hands.   Dr. Johns reviewed radiographs and concluded [Keys] had only minimal arthritic changes in his hands.   Dr. Johns further opined that [Keys] had no particular problem at his index finger joint.   Dr. Johns gave [Keys] an injection, which [he] tolerated well. . . .

[Keys] was diagnosed with hepatis C.   [Keys] was treated for a short period for hepatitis C but only partially responded to treatment.   Despite this, [Keys] received no therapy for hepatis C, and reported no further complications.

(Administrative Record at 16-17.)

Having reviewed the entire record, the Court finds that the ALJ properly considered and weighed the opinion evidence provided by Dr. Kozeny, and considered Dr. Kozeny's opinions in context of Keys' entire medical history.   Therefore, the Court determines that the ALJ provided "good reasons" both explicitly and implicitly for rejecting Dr. Kozeny's opinions.   *See* 20 C.F.R. § 404.1527(d)(2); *Strongson*, 361 F.3d at 1070; *Edwards*, 314

F.3d at 967. Accordingly, even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

### 2. Substantial Medical Evidence

Keys argues that the ALJ's RFC assessment is not based on substantial evidence as a whole. Specifically, Keys asserts that the ALJ's RFC assessment is not supported by substantial medical evidence because the ALJ rejected Dr. Kozeny's opinions. Keys concludes that this matter should be remanded to fully and fairly develop the medical evidence in the record, especially the opinions of Dr. Kozeny.

When an ALJ determines that a claimant is not disabled, he or she concludes that the claimant retains the residual functional capacity to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Beckley*, 152 F.3d at 1059. The ALJ is responsible for assessing a claimant's RFC, and his or her assessment must be based on all of the relevant evidence. *Guilliams*, 393 F.3d at 803; *see also Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (same). Relevant evidence for determining a claimant's RFC includes "'medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006) (quoting *Strongson*, 361 F.3d at 1070). While an ALJ must consider all of the relevant evidence when determining a claimant's RFC, "the RFC is ultimately a medical question that must find at least some support in the medical evidence of record." *Casey*, 503 F.3d at 697(citing *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004)).

Here, the ALJ properly considered Keys' medical records, observations of treating and non-treating physicians, and Keys' own description of his limitations in making her RFC assessment for Keys.[4] *See Lacroix*, 465 F.3d at 887. Significantly, the Court found

---

[4] *See* Administrative Record at 15-18 (providing thorough discussion of the relevant
(continued...)

in section *V.B.1* of this ruling, that the ALJ properly rejected the opinions of Dr. Kozeny. In particular, the Court found that the ALJ considered the medical evidence in the record as a whole, including the opinions of other treating and non-treating physicians, and properly rejected Dr. Kozeny's opinions as inconsistent with the medical record as a whole. Accordingly, the Court finds that the ALJ's decision is based on a fully and fairly developed record. *See Cox*, 495 F.3d at 618 (providing that an ALJ also has a duty to develop the record fully and fairly). Because the ALJ considered the medical evidence as a whole, the Court concludes that the ALJ made a proper RFC determination based on a fully and fairly developed record, including the opinions of treating and non-treating medical sources. *See Guilliams*, 393 F.3d at 803; *Cox*, 495 F.3d at 618.

### 3.    *Credibility Determination*

Keys argues that the ALJ failed to properly evaluate his subjective allegations of pain and disability. Keys maintains that the ALJ's credibility determination is not supported by substantial evidence. The Commissioner argues that the ALJ properly considered Keys' testimony, and properly evaluated the credibility of his subjective complaints.

When assessing a claimant's credibility, "[t]he [ALJ] must give full consideration to all the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; [and] (5) functional restrictions." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The absence of objective medical evidence to support a claimant's subjective complaints is also a relevant factor for an ALJ to consider. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (citation omitted). The ALJ, however, may not disregard a claimant's subjective complaints "solely because the

---

[4](...continued)
evidence for making a proper RFC determination).

objective medical evidence does not fully support them." *Polaski*, 739 F.2d at 1322; *see also Dukes v. Barnhart*, 436 F.3d 923, 928 (8th Cir. 2006) ("In discrediting subjective claims, the ALJ cannot simply invoke *Polaski* or discredit the claim because they are not fully supported by medical evidence.").

Instead, "'[a]n ALJ may discount a claimant's subjective complaints only if there are inconsistencies in the record as a whole.'" *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) (quoting *Porch v. Chater*, 115 F.3d 567, 572 (8th Cir. 1997)); *see also Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) ("The ALJ may not discount a claimant's complaints solely because they are not fully supported by the objective medical evidence, but the complaints may be discounted based on inconsistencies in the record as a whole."). If an ALJ discounts a claimant's subjective complaints, he or she is required to "'detail the reasons for discrediting the testimony and set forth the inconsistencies found.'" *Ford v. Astrue*, 518 F.3d 979, 982 (8th Cir. 2008) (quoting *Lewis v. Barnhart*, 353 F.3d 642, 647 (8th Cir. 2003)); *see also Baker v. Apfel*, 159 F.3d 1140, 1144 (8th Cir. 1998) ("When rejecting a claimant's complaints of pain, the ALJ must make an express credibility determination, must detail reasons for discrediting the testimony, must set forth inconsistencies, and must discuss the *Polaski* factors."). Where an ALJ seriously considers, but for good reason explicitly discredits a claimant's subjective complaints, the Court will not disturb the ALJ's credibility determination. *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing *Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996)); *see also Guilliams*, 393 F.3d at 801 (explaining that deference to an ALJ's credibility determination is warranted if the determination is supported by good reasons and substantial evidence); *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003) ("If an ALJ explicitly discredits the claimant's testimony and gives good reasons for doing so, we will normally defer to the ALJ's credibility determination."). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" *Wagner*, 499 F.3d at 851 (quoting *Pearsall*, 274 F.3d at 1218).

In addressing Keys' credibility, the ALJ made the following observations:

> After careful consideration of the evidence, I find that [Keys']
> medically determinable impairments could reasonably be
> expected to cause the alleged symptoms; however, [Keys']
> statements . . . concerning the intensity, persistence and
> limiting effects of these symptoms are not credible to the
> extent they are inconsistent with the above residual functional
> capacity assessment. . . .
>
> [Keys'] activities of daily living are consistent with the residual
> functional capacity described above.   [Keys] reported to
> treating physicians that he spent a great deal of time baby-
> sitting school age and younger kids at home. [Keys] is able to
> prepare four children for school, complete some housework,
> walk his children to school, perform grocery shopping, and
> exercise on his treadmill.  Although [Keys] alleged disabling
> pain, he does not take prescription pain medication.  Instead,
> [Keys] uses conservative measures such as hot showers and
> over the counter pain relievers.   Despite the complaints of
> allegedly disabling symptoms, there have been significant
> periods since the alleged onset date during which [Keys] has
> not taken any medication for those symptoms.  In general,
> [Keys] has not received the type of medical treatment one
> would expect for a totally disabled individual.

(Administrative Record at 17-18.)

It is clear from the ALJ's decision that she thoroughly considered and discussed
Keys' treatment history, medical history, functional restrictions, effectiveness of
medications, and activities of daily living in making her credibility determination. Thus,
having reviewed the entire record, the Court finds that the ALJ adequately considered and
addressed the *Polaski* factors in determining that Keys' subjective allegations of pain and
disability were not credible. *See Johnson*, 240 F.3d at 1148; *see also Goff*, 421 F.3d at
791 (an ALJ is not required to explicitly discuss each *Polaski* factor, it is sufficient if the
ALJ acknowledges and considers those factors before discounting a claimant's subjective
complaints); *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not
required to discuss each *Polaski* factor as long as the analytical framework is recognized

and considered. *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)."). Accordingly, because the ALJ seriously considered, but for good reasons explicitly discredited Keys' subjective complaints, the Court will not disturb the ALJ's credibility determination. *See Johnson*, 240 F.3d at 1148. Even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

## VI. CONCLUSION

The Court finds that the ALJ properly considered the medical evidence and opinions in the record, including the opinions of Dr. Kozeny. The ALJ also properly considered Keys' medical records, observations of treating and non-treating physicians, and Keys' own description of his limitations in making her RFC assessment for Keys. Finally, the ALJ properly determined Keys' credibility with regard to his subjective allegations of pain and disability. Accordingly, the Court determines that the ALJ's decision is supported by substantial evidence and shall be affirmed.

## VII. ORDER

For the foregoing reasons, it is hereby **ORDERED**:

1.     The final decision of the Commissioner of Social Security is **AFFIRMED**;

2.     Plaintiff's Complaint (docket number 3) is **DISMISSED** with prejudice; and

3.     The Clerk of Court is directed to enter judgment accordingly.

DATED this _14th_ day of May, 2012.

_____
JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA